IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SUSAN JORDAN,

        Plaintiff,

v.                                    Civil Action No.  2:04CV42
                                         (Judge Robert E. Maxwell)

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant" and sometimes "the Commissioner") denying the

Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Susan A. Jordan (Plaintiff) filed for Supplemental Security Income benefits on July 8, 1998[1].

---

[1]On June 5, 1991, Plaintiff filed for DIB and SSI alleging disability since August 8, 1989, for a neck injury and emotional problems.  These applications were denied initially and upon consideration.  The ALJ issued a decision granting Plaintiff a closed period of benefits between August 1989 and September 1990 and found that medical improvement occurred after September 1990.  The Appeals Council remanded the case to the Administrative Law Judge on June 9, 1993, instructing him to reconcile the medical improvement issue with the ability to perform substantial gainful activity and cessation requirements.  On April 18, 1994, the ALJ found Plaintiff could perform light work and could return to her past relevant work and that she had not been disabled at anytime through September 30, 1992.  On October 14, 1994, the Appeals

alleging disability since July 1, 1989, due to depression, nerves, a back injury, and borderline intellectual functioning (R. 17, 33, 155). This application was denied initially and upon reconsideration. Plaintiff requested a hearing, which the Administrative Law Robert Pulcini held on June 13, 2000, in Lewisburg, West Virginia, and at which Plaintiff, who was represented by Susan H. Hewman, Esquire, Sandra M. Wells, Ed.D. ("VE"), and Robert L. Muller, Ph.D., a medical expert, testified (R. 34). On July 27, 2000, the ALJ issued a decision in which he found Plaintiff was not disabled and Plaintiff appealed this decision to the Appeals Council (R. 111). On July 24, 2002, the Appeals Council vacated the ALJ's decision and remanded Plaintiff's SSI claim for hearing (R. 121-23). On November 20, 2002, ALJ Thomas R. King in Lewisburg, West Virginia, conducted an administrative hearing, at which Plaintiff, represented by counsel, Kelsey C. Burnette, Esquire, Herbert Pearis, VE, and Clifford G. Gaddy, M.D., a medical expert, testified (R. 17, 485-560). On January 29, 2003, the ALJ issued a decision finding Plaintiff, although unable to

---

Council upheld the ALJ's April 18, 1994 decision. Plaintiff appealed this decision to the United States District Court for the Northern District of West Virginia. On November 14, 1995, the District Judge adopted and affirmed the United States Magistrate Judge's recommendation that Defendant's motion for summary judgment be granted and the civil action appeal be dismissed. Since *res judicata* applies to the District Judge's decision, the April 18, 1994, decision by the ALJ remains final and binding and establishes the Plaintiff's disability status through September 30, 1992 (R. 32-33).

On May 23, 1995, Plaintiff filed a second application for DIB and on August 23, 1995, filed her second application for SSI. Plaintiff's alleged disability since August 8, 1989, due to a back condition and a neck injury. On May 30, 1997, a dismissal of both claims was issued finding the claims could not be reopened because of *res judicata*. The request for the administrative hearing was dismissed. The Appeals Council denied Plaintiff's request for review of the dismissal of her DIB application. On July 9, 1997, a hearing before the Appeals Council was requested, and on December 17, 1998, the Appeals Council remanded the SSI application decision based on an error of law because the issues were not the same as the issues contained in the June 5, 1991 application. A request for a hearing on the August 23, 1995, SSI application was filed by Plaintiff and was considered by ALJ Robert A. Pulcini at a June 13, 2000, administrative hearing (R. 33-34).

perform any of her past occupations, would be capable of performing the representative unskilled light occupation of janitor, which constitutes significant numbers of jobs in the local and national economy (R. 25-26). Subsequent to the ALJ's finding, the Appeals Council denied Plaintiff's request for review of the hearing decision, making the ALJ's decision the final decision of the Commissioner (R. 5-6).

## II. FACTS

Plaintiff was born on December 22, 1956, and was forty-six (46) years old at the time the ALJ rendered his decision (R. 140, 145, 489). Plaintiff completed the sixth grade of school and had past employment as a public school janitor (R. 157, 161-62).

The issues in contention in this Social Security Appeal are based on Plaintiff's mental impairments; therefore, the undersigned includes in this section only medical and mental health information relative to that issue.

Records from the Webster County Schools list Plaintiff's IQ as "77." This notation appears on the score card of a "Stanford Achievement Test" form and was dated June 19, 1969 (R. 370).

On February 3, 1998, Raymond S. Krautheim, Plaintiff's mental health counselor at Seneca Mental Health/Mental Retardation Council, Inc., located in Webster Springs, West Virginia, corresponded with Plaintiff's lawyer, stating that Plaintiff's functioning level is low and that she had chronic pain syndrome and major depression. He opined Plaintiff was functionally illiterate and "may have [a] serious learning disability" (R. 238).

On August 27, 1998, Plaintiff was treated by Robert Mace, M.D., for nervousness and anxiety which resulted from her recent divorce. He prescribed Wellbutrin 150mg (R. 295).

On September 14, 1998, an Adult Mental Profile was completed of Plaintiff by Thomas C.

Stein, Ed.D., of Primary Psychological Care, P.L.L.C., located in Moorefield, West Virginia (R. 255-259). Plaintiff stated she was unable to work because her "mind don't stay focused very long on anything. It just seems to wander a lot." She described her mental state as follows: "I get real nervous throughout the day and get to like where I just want to scream. After that I go and have these crying spells a whole lot. . . . I don't know how to read or write too well either" (R. 255). Mr. Stein noted Plaintiff had completed the sixth grade of school before "quitting at the age 15 because" she "'couldn't do the school work'" (256).

Mr. Stein noted Plaintiff had "been treated for problems with recurrent depression from October, 1993 to the present time." He observed she had received "outpatient counselling [sic] once per week with a therapist at the Seneca Mental Health Center" and that Plaintiff had been consulting a psychiatrist once a month at that facility (R. 256).

Mr. Stein's evaluation revealed Plaintiff "displayed good memory for remote events," "fair memory for recent events," and "fair memory for immediate recall." Mr. Stein opined Plaintiff was "moderately depressed." He noted Plaintiff's "[l]anguage usage was average, speed of speaking was slow, and the content of her verbalization was relevant" and "[t]he overall quality of her speech was normal and her overall conduct was cooperative and attentive." Her affect was subdued. Plaintiff described her mood as "'sad, mourning like someone died.'" Mr. Stein observed Plaintiff was "very preoccupied in her thinking as would relate to her recent divorce and her "'worry about what is going to happen to'" her in the future (R. 257).

Mr. Stein administered the Wechsler Adult Intelligence Scale – Revised (WAIS-R) test, on which Plaintiff achieved the following scores: Verbal IQ – 74; Performance IQ – 83; Full Scale IQ – 78. He opined the Full Scale IQ was "indicative of borderline intellectual functioning" (R. 257).

4

Plaintiff achieved a second grade equivalent score in reading, spelling, and arithmetic on the WRAT-III test. Mr. Stein noted the scores on the tests to be valid. He found the following diagnostic impressions for Plaintiff: 1) Axis I – depression, recurrent type; 2) Axis II – borderline intellectual functioning; 3) Axis III – post hysterectomy and osteoarthritis as "per patient report" (R. 258).

During the evaluation, Plaintiff reported to Mr. Stein that she rose at 9:00 a.m. or 10:00 a.m.; prepared and consumed coffee; watched television; prepared and consumed breakfast; performed household chores, which included dusting, sweeping, mopping, vacuuming, and grocery shopping; did laundry; prepared and consumed dinner; watched television; and retired at 8:00 p.m. Plaintiff stated she had to "'take a lot of breaks and gotta go real slow'" as she did housework. Plaintiff reported she did not attend church, dine at restaurants, write checks, perform lawn work, or belong to any clubs. Plaintiff stated she collected angel birds as a hobby, played with her grandchild for entertainment, and exercised by walking her grand child one (1) time per week. Mr. Stein opined that Plaintiff was mildly impaired in social functioning. He noted Plaintiff presented moderately impaired concentration, adequate pace, and fair persistence. Mr. Stein opined that Plaintiff could manage her own financial affairs (R. 258-59).

On September 23, 1998, a Mental Residual Functional Capacity Assessment was completed of Plaintiff by a state agency physician. Plaintiff was found to have no limitation in her ability to remember locations and work-like procedures and understand and remember very short and simple instructions. Plaintiff was found to be moderately limited in her ability to understand and remember detailed instructions. Her ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to sustain an ordinary routine without special supervision were found to be moderately limited. Plaintiff was found to have no limitations in her

ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to make simple work-related decisions (R. 260-61). It was further found Plaintiff had no limitations in her social interaction or adaptation abilities (R. 261).

On September 24, 1998, Plaintiff was again examined by Dr. Mace. She stated she felt "a little bit better with the Wellbutrin" (R. 294). On October 19,1998, Plaintiff informed Dr. Mace she was again taking Zoloft and had stopped taking Wellbutrin (R. 293). On November 2, 1998, Plaintiff visited Dr. Mace, at which time he noted she was "still nervous and depressed over her recent divorce" (R. 292). On December 2, 1998, Plaintiff reported to Dr. Mace she was "still depressed over her divorce and not sleeping or eating too well." Dr. Mace noted Plaintiff appeared to be "a little depressed" (R. 291). On January 12, 1999, Plaintiff was examined by Dr. Mace. She informed the doctor she had been "taking her Zoloft 100mg and . . . [t]his [was] somewhat helpful" (R. 290).

On January 29, 1999, a Confidential Psychological Evaluation was completed of Plaintiff by Sharon Fleschner, M.A., a supervised psychologist, and Paul R. Wiese, Ph.D., a licensed psychologist (R. 276-81). Plaintiff stated she experienced "'nerve problems,'" which manifested in her crying "for no reason," her "insides" shaking, and her not being able to "stop thinking about the bad things." Plaintiff stated the "worst depression [had] transpired since the recent divorce from her husband of 17 years." Plaintiff reported to the examiners that she lived in her mother's house,

6

which was given to her upon her mother's death and was supported financially, and oftentimes emotionally, by family. Plaintiff's education experience was "comprised of special education classes"; she was "'held back in either second or third grade.'" Plaintiff informed the examiners that she attended vocational-technical classes from age fourteen (14) until she quit school at age sixteen (16) to marry her first husband (R. 277). Plaintiff's mental status was observed to be as follows: 1) she was alert and cooperative; 2) her speech was commensurate with her sociocultural level and intellectual functioning; 3) her attention was adequate; 4) her fund of knowledge was impoverished; 5) her concentration was limited; 6) her recent memory was somewhat disrupted; 7) her immediate and remote memory were not significantly disrupted; 8) her thinking was concrete; 9) she could interpret simple proverbs; 10) she was unable to interpret higher level abstractions; 11) she was distressed and cried frequently when conversing about her former husband and her son; 12) she had suicidal thoughts when she was seventeen (17) years old; 13) she demonstrated no unusual thought content; and 14) her judgment and ability to understand social situations were limited (R. 278).

The Wechsler Adult Intelligence Scale-III (WAIS-III) was administered to Plaintiff and she scored the following: 1) Verbal IQ - 74; 2) Performance IQ - 83; and 3) Full Scale IQ - 78 (R. 278). The Wide Range Achievement Test (WRAT-3) was administered to Plaintiff and she scored the following: 1) Reading – second grade; 2) Spelling – second grade; and 3) Arithmetic – third grade. The examiners noted these were scores that classified Plaintiff as intellectually deficient (R. 279-80). The Minnesota Multiphasic Personality Inventory-2 (MPPI-2) was administered to Plaintiff and the valid profile revealed that she had a "tendency to present herself in a favorable light and minimize implications of poor emotional control and personal ineffectiveness" (R. 280). Plaintiff's score on the Beck Depression Inventory (BDI) was forty-three (43), which indicated severe

depression; her score on the Beck Anxiety Inventory (BAI) was thirty-eight, which indicated severe anxiety (R. 279). The examiners opined that Plaintiff was "experiencing significant depression. The depressive episode reflects feelings of discouragement, pessimism, lack of energy, and apprehension about the future . . ." (R. 280). The diagnostic impression was as follows: 1) Axis I – major depressive disorder (recurrent, without psychotic features), generalized anxiety disorder, and reading disorder; 2) Axis II – borderline intellectual functioning; 3) Axis III – chronic lower back and cervical strain and hysterectomy; 4) Axis IV – problems with primary support group (divorce), problems related to the social environment (some social withdrawal), educational problems (illiteracy), occupational problems (unemployment due to disabilities), and economic problems (inadequate finances); and 5) Axis V – GAF of 52. The examiners opined that "[d]ue to the combination of psychological, educational, physical, and functional limitations . . . [Plaintiff] is totally disabled currently, with projected disability to continue for the next 12 consecutive months" (R. 281).

On February 1, 1999, Sharon Fleschner, M.A., completed a Medical Assessment of Ability to do Work-Related Activities (Mental) of Plaintiff (R. 282-85). Plaintiff was found to demonstrate a fair ability to follow simple work rules, relate to co-workers, and interact with supervisors. Her poor ability to deal with the public, use judgment, deal with work stresses, function independently, and maintain attention/concentration was found to be poor (R. 283). Ms. Fleschner noted Plaintiff demonstrated "significant deficits . . . in focused and sustained concentration in relation to cognitive functioning and effects of major depressive mood disorder" (R. 283). Plaintiff's ability to understand, remember, and carry out simple job instructions was found to be fair, and her ability to understand, remember, and carry out complex job instructions and detailed, but not complex,

8

instructions was found to be poor (R. 283). Plaintiff was found to possess a good ability to maintain personal appearance but a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability (R. 284). Plaintiff was found to be able to manage benefits in her own best interest with the assistance of another (R. 285).

On August 17, 1999, L. Andrew Steward, Ph.D., completed a psychological evaluation of Plaintiff (R. 339-42). Dr. Steward completed the WAIS-III and the Rorschach examinations and conducted a clinical interview of Plaintiff. Plaintiff was observed to have participated "diligently on the test items, and the results of [the] evaluations [were] believed to be valid and reliable" (R. 339). Dr. Steward noted Plaintiff had "never been psychiatrically hospitalized" (R. 341). Plaintiff stated she had no current hobbies, but that she once enjoyed sewing, embroidering, jogging, playing volleyball, swimming, and horseback riding. She belonged to no clubs or churches (R. 341). The WAIS-III was administered and the results were as follows: 1) Verbal IQ – 66; 2) Performance IQ – 65; and Full Scale IQ – 63 (R. 341). Her intellectual abilities were found to be uniformly deficient. Plaintiff was found by Dr. Steward to be "functioning overall in the Mild Mental Retardation range which appears to be a lifelong condition based upon her educational, employment, behavioral, and test performances." She demonstrated "gross deficits in thinking and reasoning abilities . . . ." Plaintiff was found to be deficient in her visual-motor coordination skills, use of numbers, general fund of knowledge, reasoning ability, commonsense, long-term memory processing, ability to interpret social situations, speed of performance, ability to use words, and flexibility in new learning situations. Dr. Steward found Plaintiff to possess no intellectual strengths. Dr. Steward found Plaintiff had "developed anxiety and depression." He opined that the "combination and severity of factors do appear to make her functionally disabled to work . . . on an

9

indefinite basis and at least for a period of one year. Prognosis appears quite guarded, and she should remain in psychotherapeutic intervention. She does appear capable of managing her own funds" (R. 342).

On September 13, 1999, an Adult Mental Profile of Plaintiff was completed by Thomas C. Stein, Ed.D. (300-310). He conducted a clinical interview and completed WAIS-III, Mental Status Examination, WRAT-III, and MMPI of Plaintiff. Mr. Stein observed Plaintiff's speech to be "relevant, coherent and normal paced"; orientation to be adequate to time, place, person and date; mood to be moderately depressed; affect to be labile; thought process to be normal; thought content to be normal; perception to be normal; insight to be fair; judgment to be poor; suicidal/homicidal ideations to be absent; immediate memory to be mildly deficient; recent memory to be moderately deficient; remote memory to be mildly deficient; concentration to be poor; and psychomotor behavior to be normal (R. 304-05). On the WAIS-III examination, Plaintiff's Verbal IQ was scored at 75; Performance IQ was scored at 69; and Full Scale IQ was scored at 70 (R. 306). Mr. Stein opined that the internal and external validity of the WAIS-III was good and assessed Plaintiff's intellectual functioning as borderline range of intelligence. Plaintiff scored the following on the WRAT-III: 1) Reading – second grade; 2) Spelling – first grade; and 3) Arithmetic – second grade. Mr. Stein opined the results were valid (R. 307). The MMPI was orally administered to Plaintiff, some of the questions were explained to Plaintiff, and all of Plaintiff's responses were recorded for her. Mr. Stein found Plaintiff was "in the midst of an anxious or agitated type of depression that is characterized by confused and disorganized thinking, non-productive ruminating, low feelings of self-worth, heightened sensitivity to anything that can be construed as a criticism or rejection and moderate levels of physical/somatic complaints as well as a low psychic and physical energy level."

10

The results were determined to be valid (R. 308).

Mr. Stein found Plaintiff's objective symptoms to be for moderate depression, moderate anxiety, rumination about problems to the point that [Plaintiff] is actually beyond being preoccupied and approaching an obsessive thinking level, borderline intelligence, and functional illiteracy (R. 308). The following diagnosis was made by Mr. Stein: 1) Axis I – pain disorder associated with general medical condition and psychological factors and major depression, recurrent type (with anxious features); 2) Axis II – borderline intellectual functioning (cultural in origin, chronic and stable); 3) Axis III – chronic neck, shoulder and back pains, nervous stomach and fluid retention – as "per patient report." The prognosis was fair (R. 309).

Plaintiff reported her activities of daily living were as follows: awoke at 8:00 a.m., dressed, prepared and drank coffee, watched television for two (2) hours, completed light housework, rested, prepared and ate mid-day meal, watched television, napped for ninety (90) minutes, prepared and ate light supper, watched television, telephoned her son, showered, and retired at 9:00 p.m. Plaintiff stated she managed her own personal hygiene, cooked, cleaned in "bursts," washed dishes, did laundry, shopped, ran errands, drove, walked, sat on the porch, maintained a wood stove during the cold months, and collected ceramic angels and birds. Plaintiff did not do any yard or gardening work (R. 309).

Mr. Stein found Plaintiff's concentration to be moderately deficient, persistence to be mildly deficient, and pace to be moderately slow. He opined Plaintiff could manage her own financial affairs (R. 310).

On September 13, 1999, Mr. Stein also completed a Medical Assessment of Ability to do Work-Related Activities (Mental) of Plaintiff (R. 311-14). Mr. Stein opined that Plaintiff's ability

11

to follow work rules, relate to co-workers, and interact with supervisors was good; ability to deal with the public, use judgment, functional independently, and maintain attention/concentration was fair; and ability to deal with work stresses was poor. Mr. Stein found Plaintiff's ability to understand, remember, and carry out simple job instructions was fair and her ability to understand, remember, and carry out detailed, but not complex, job instructions was poor (R. 312). Mr. Stein found Plaintiff's ability to maintain personal appearance to be good and her ability to behave in an emotionally stable manner, relate predictability in social situations, and demonstrate reliability to be fair (R. 313). Plaintiff was found to be able to manage benefits (R. 314).

On November 19, 1999, Raymond S. Krautheim, a counselor at Seneca Health Services, wrote to Plaintiff's counsel. Within the correspondence, he noted Plaintiff's continued care at Seneca from 1993 for a diagnosis of major depression, which was in partial remission; generalized anxiety; and borderline intellectual functioning. He opined Plaintiff's efforts to "understand and cope with her problems" were genuine, but she continued to be frustrated. He further opined that Plaintiff was "not likely . . . [to] ever maintain a consistant [sic] level of functioning to meet the needs of gainful employment" (R. 319).

On June 14, 2001, a Psychological Report of Plaintiff was completed by William D. Hagerty, M.A., a licensed psychologist at Seneca Health Services, which included a clinical interview, a records review, and the administration of the Test of Nonverbal Intelligence (TONI-3) and the Minnesota Multiphasic Personality Inventory – 2 (MMPI-2). The results of the TONI-3 revealed Plaintiff was "functioning within the Poor range of intellect, which is consistent with her previous diagnosis of Borderline Intellectual Functioning." The results of the MMPI-2 were for strong dissatisfaction, low ego strength, poor self-concept, bluntness, overly critical attitude, depression,

12

unacceptable impulses, feelings of resentment, moodiness, rigidity, being uncomfortable in social situations and sexual interactions, introvertedness, insecurity, and avoidance. Mr. Hagerty's diagnosis was for the following: 1) Axis I – major depressive disorder, moderate, recurrent and generalized anxiety disorder; 2) Axis II – borderline intellectual functioning; 3) Axis III – back injury; 4) Axis IV – psycho social stressors (moderate); and 5) Axis V – GAF 50. Mr. Hagerty concluded that Plaintiff was not psychotic, but depressed (R. 375).

On August 1, 2001, a state-agency physician completed a Mental Residual Functional Capacity Assessment of Plaintiff. Plaintiff was found to not be significantly limited in her ability to 1) remember locations and work-like procedures and very short and simple instructions; and 2) carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions. Plaintiff was found to be moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods (R. 392). The state-agency physician also found Plaintiff to not be significantly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, or to set realistic goals or

13

make plans independently of others. Plaintiff was found to have moderate limitations in her ability to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting (R. 393). The state-agency physician noted Plaintiff retained "the capacity to understand, remember and carry out at least 1-2 step instructions. With impaired social skills, she retains the capacity to manage a low social interaction demand work setting. Her capacity to manage stress/pressure at work is at the low pressure level" (R. 394).

On November 13, 2002, a Psychiatric Evaluation was completed of Plaintiff by Lois A. Urick, M.D., a staff psychiatrist at Seneca Health Services (R. 462-63). Dr. Urick considered Plaintiff's past mental health history and the 1999 full-scale WAIS-III score of 63, which caused the diagnosis of mild mental retardation. Dr. Urick noted Plaintiff was subsequently diagnosed with borderline intellectual functioning and stated "but the reason for this change is unclear in the absence of a repeated complete cognitive evaluation" (R. 462). Dr. Urick assessed Plaintiff's functioning as being "very significantly affected by personality issues, which cause her to have a great deal of difficulty interacting with others in an emotionally stable and appropriate manner." Dr. Urick opined that Plaintiff's "transient psychotic features are most probably a manifestation of this personality disorder, rather than a separate psychotic disorder. Depression with anxiety is a significant problem for her as well; it is likely that she suffers from a primary depressive disorder which is in constant exacerbation because of her frequent emotional lability in response to interpersonal problems. Her limited cognitive abilities affect not only her daily functioning, but also her ability to understand her own personality issues and to make changes. It is my opinion that this patient would be unable to maintain employment due to her significant emotional difficulties." Dr. Urick diagnosed the following: 1) Axis I – major depressive disorder, recurrent, moderate and

14

bereavement; 2) Axis II – personality disorder NOS with borderline traits and mild mental retardation; 3) Axis III – chronic pain, hypertension; 4) Axis IV – problems related to social environment; and 5) Axis V – GAF 55 (R. 463).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ King made the following findings:

1.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.  The claimant has the following impairments considered "severe" based on the requirements in the regulations at 20 CFR §416.920(b): borderline intellectual functioning, a personality disorder, major depression, and chronic back strain.

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  I find the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §416.927).

6.  The claimant retains the residual functional capacity for unskilled work at the light exertional level.

7.  The claimant is unable to perform any of her past relevant work (20 CFR §416.965).

8.  The claimant is a "younger individual under the age of 50" (20 CFR §416.963).

9.  The claimant has a "marginal education" (20 CFR §416.964).

10. The claimant has no transferable skills from any past relevant work (20 CFR §416.968).

15

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §416.967).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. An example of such jobs includes work as a light janitor.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §416.920(f)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ's conclusion that Plaintiff does not suffer from an impairment that meets or equals the Listings of impairments at 20 CFR Part 404, Subpart P., App.1, § 12.05C is not supported by substantial evidence.

2.    The ALJ's findings concerning the claimant's mental residual functional capacity and education are not supported by substantial evidence.

The Commissioner contends:

1.    The final decision of the Commissioner that Plaintiff could perform the alternative work identified by the vocational expert is supported by substantial evidence.

## C. Listing 12.05C

The Plaintiff contends that the ALJ's conclusion that Plaintiff does not suffer from an impairment that meets or equals the Listings of impairments at 20 CFR Part 404, Subpart P., App. 1, § 12.05C is not supported by substantial evidence.

Listing 12.05 is defined, in part, as follows:

12.05 *Mental Retardation:* mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function; . . . .

The ALJ found as follows:

The evidence supports a finding that the claimant has borderline intellectual

functioning, a personality disorder, major depression, and chronic back strain –
medically determinable impairments that more than minimally impact her functional
capabilities and are "severe" as defined in **Evans** (R. 19).

I find that the claimant's mental impairments (borderline intellectual functioning, a
personality disorder, major depression, and a generalized anxiety disorder) have
caused "mild" restriction of her activities of daily living; "moderate" difficulties in
maintaining social functioning; "moderate" difficulties in maintaining concentration,
persistence, and pace; and no episodes of decompensation. Evidence does not
establish the presence of the "C" criteria (R. 22)

In reaching this conclusion, the ALJ considered the results of tests administered by Mr. Stein

and Dr. Steward. On September 14, 1998, Mr. Stein evaluated Plaintiff's mental standing. The

ALJ considered the results of the WAIS-R as noted by Mr. Stein, wherein Plaintiff's Verbal IQ was

74, Performance IQ was 83, and Full Scale IQ was 78. The ALJ noted Mr. Stein's finding that the

scores were valid. The ALJ considered Mr. Stein's diagnoses of depression, recurrent type; pain

disorder associated with general medical condition and psychological factors; and borderline

intellectual functioning. The ALJ further evaluated Plaintiff's activities "around the home" and Mr.

Stein's rating that Plaintiff was "'mildly impaired'" in social functioning and "'moderately

impaired'" in concentration. He also acknowledged Mr. Stein's findings that Plaintiff's pace was

"'adequate'" and her persistence was "'fair'" (R. 19).

The ALJ then considered and evaluated the August 17, 1999, findings of Dr. Steward as to

Plaintiff's psychological evaluation. He noted Plaintiff "was upset about her divorce and cried

almost constantly throughout the interview." The ALJ acknowledged Plaintiff's WAIS-III scores

as Verbal IQ 66, Performance IQ 65, and Full Scale IQ 63. He considered Dr. Steward's conclusion

that "'[t]he combination [mild mental retardation, several physical problems, and anxiety, and

depression] and severity of factors do appear to make her functionally disabled to work and she will

most likely be so on an indefinite basis and at least for a period of one year. Prognosis appears quite guarded, and she should remain in psychotherapeutic intervention'" (R. 20).

The ALJ considered and evaluated the findings of September 13, 1999, by Mr. Stein as to Plaintiff's psychological evaluation. He noted Mr. Stein "reaffirmed the validity of IQ scores in 70s, which were obtained by the claimant when tested in September 1998 and which indicated borderline intellectual functioning." The ALJ then noted that "[o]n this occasion, when administered the WAIS-III intelligence test, the claimant obtained the following IQ scores: verbal, 75; performance, 69; and full scale, 70." The ALJ considered Dr. Stein's opinion relative to Plaintiff's objective symptoms, specifically, that Plaintiff was "'moderately depressed, moderately anxious and ruminating about her problems to the point that she is actually beyond being preoccupied and approaching an obsessive thinking level." The ALJ acknowledged Mr. Stein's diagnose of borderline intelligence and functionally illiterate. The ALJ considered Plaintiff's activities of daily living as revealed to Mr. Stein and Mr. Stein's conclusions that Plaintiff was mildly deficient in social functioning, moderately deficient in concentration, mildly deficient in persistence, and moderately slow in pace (R. 20-21).

The ALJ then concluded the following:

A WAIS-R intelligence test administered by Dr. Stein yielded IQ scores in the 70s (Exhibit 5F). Then Dr. Steward gave the claimant a WAIS-III test (August 17, 1999) in which she obtained IQs in the 60s (Exhibit 21F). Dr. Stein re-tested the claimant (September 13, 1999) with WAIS-III examination in which the claimant obtained IQ scores in the 60s and 70 (Exhibit 14F), but he stood by his earlier determination that the claimant had borderline intellectual functioning. I find that the WAIS-III scores, which were both recorded within one month in 1999, were depressed because of the claimant's depressive symptoms, which were addressed by both Dr. Steward and Dr. Stein. Thus, I find that the claimant's valid IQ scores, when not depressed by her other mental impairments, are 71 or higher (R. 23).

The Plaintiff, in her brief, argued the following:

> The Administrative Law Judge had no basis, other than his own lay medical opinion, for determining that [Plaintiff's] IQ scores in 1999 would have been 71 or higher if she were not depressed when she was tested. The Administrative Law [Judge] exercised an expertise he does not possess when he relies on his own lay opinion instead of the opinion of medical professionals. *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).
>
> ... [Plaintiff] was diagnosed as depressed in every psychological evaluation in the record. Dr. Stein stated [Plaintiff] was moderately depressed in 1998 when he found that she had higher IQ scores (Tr. 258) (Plaintiff's brief at p. 10).

The undersigned agrees with this argument. The evidence of record certainly affirms that Plaintiff was depressed at her 1999 evaluations with Dr. Steward and Mr. Stein. On August, 17, 1999, Dr. Steward observed that Plaintiff "cried almost constantly throughout the interview, particularly when discussing her divorce" and found that Plaintiff was anxious and depressed (R. 342). On September 13, 1999, Mr. Stein observed that Plaintiff was labile and experienced "crying episodes" and found that Plaintiff was "moderately depressed, moderately anxious and ruminating about her problems to the point that she is actually beyond being preoccupied and approaching an obsessive thinking level," borderline intelligent, and functionally illiterate (R. 301, 302, 308). The ALJ considered these observations and opinions in his decision (R. 20, 23). The record of evidence, however, also revealed that Plaintiff exhibited depressive symptoms at the September 14, 1998, psychological evaluation by Mr. Stein, that evaluation on which the ALJ relied in making his decision that Plaintiff did not meet the requirements of Listing 12.05C. Mr. Stein noted Plaintiff experienced "depression, chronic pain, and learning disability" (R. 255). He noted Plaintiff had "been treated for problems with recurrent depression from October, 1993 to the present time" and that she had received outpatient counseling and psychiatric care during that time period. Mr. Stein's

mental examination contained Plaintiff's description of "her mood as 'sad, mourning like someone died' and statement that she experienced "crying spells a whole lot." He described her mood as "moderately depressed." Mr. Stein observed that Plaintiff was "very preoccupied in her thinking as would relate to her recent divorce, worried about what is going to happen to her in the future," and that her "[m]otor activity level was subdued," "posture was slouched," "eye contact was fair," and her "affective expression was subdued" (R. 256-57). Plaintiff was diagnosed with depression, recurrent type by Mr. Stein. The ALJ failed to consider these opinions and observations by Mr. Stein as to Plaintiff's depression in reaching his decision. These opinions and observations are similar to those made by Dr. Steward in August, 1999, and by Mr. Stein in September, 1999. The similarities in symptoms and diagnoses contained in all three evaluations negate the ALJ's reasoning that Plaintiff was demonstrating depressive symptoms in 1999 that she did not demonstrate in 1998. The undersigned, therefore, finds the ALJ's reliance on the Mr. Stein's 1998 findings to determine Plaintiff's mental status is not supported by the substantial evidence of the record.

Additionally, Plaintiff made valid efforts on each of the WAIS evaluations. On September 14, 1998, Mr. Stein opined that Plaintiff "participated in testing and seemed to put forth her best effort"; on August 17, 1999, Dr. Steward opined that Plaintiff "appeared to be trying diligently on the test items"; and on September 13, 1999, Mr. Stein opined that Plaintiff "made good test effort . . . was very cooperative . . . had good test-taking attitude." Each evaluation was determined to be valid by each examiner based on Plaintiff's participation regardless of the presence of Plaintiff's depressive symptoms; therefore, the ALJ's discounting two sets of test scores because of Plaintiff's depression and accepting one set of scores is not warranted by the substantial evidence of the record (R. 258, 307, 339).

21

In addition to the ALJ's disregarding the evidence of record as to the presence of Plaintiff's depressive symptoms during the September 14, 1998, psychological evaluations, which led him to accept this evaluation and not the August, 1999, or September, 1999, evaluations, the undersigned finds he failed to correctly apply 20 CFR Part 404, Subpart P, App.1 § 12.00(D)(6)(c), which states, in part, the following: "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." Based on this regulation, the ALJ should have relied on the Full Scale IQ score of 63, achieved by Plaintiff on the psychological evaluation administered by Dr. Steward on August 17, 1999, in determining if Plaintiff met Listing 12.05C. 20 CFR Part 404, Subpart P., App. 1, § 12.05C requires that a person's IQ score must be valid and must fall between 60-70, and there must be present "a physical or other mental impairment imposing additional significant work-related limitations of function." Plaintiff's Full Scale IQ of 63 was valid and it fell between the 60-70 range. The coupling of these criterion with the ALJ's finding that Plaintiff had ". . . personality disorder, major depression, and chronic back strain – medically determinable impairments that more than minimally impact her functional capabilities" satisfies the mandate of 20 CFR Part 404, Subpart P., App. 1, § 12.05C. The undersigned finds, therefore, that the ALJ failed to apply 20 CFR Part 404, Subpart P, App.1 § 12.00(D)(6)(c), thereby violating the mandates of 20 CFR Part 404, Subpart P., App. 1, § 12.05C in determining whether Plaintiff met a Listing.

Finally, the ALJ's finding that ". . . the claimant's school records show an IQ of 77 (Exhibit 24F); thus mental retardation with an onset before age 22 cannot be established" is without merit (R. 23). 20 CFR Part 404, Subpart P., App. 1, § 12.05C requires, in part, that a valid IQ score must be

22

achieved before the age of twenty-two (22) in order for a person to meet Listing 12.05C. In the instant case, records from the Webster County Schools contain information that Plaintiff's IQ was "77" on June 19, 1969. Plaintiff's IQ was noted on the score card of a "Stanford Achievement Test" (R. 370). There is no evidence of record that Plaintiff's IQ score of "77" in 1969 was achieved through the administration of a valid testing tool; therefore, it is evidence that should not have been considered and weighed by the ALJ. Furthermore, the establishment – or lack thereof – of a valid IQ as mandated by 20 CFR Part 404, Subpart P., App. 1, § 12.05C prior to the age of twenty-two (22) has been addressed by the Fourth Circuit. In *Luckey v. U.S. Department of Health & Human Services*, 874 F.2d 1430 (unpublished opinion), the Fourth Circuit held "the absence of an IQ test during the developmental years does not preclude a finding of mental retardation predating age 22. . . . [T]he evidence that he could barely read or write was 'a clear "manifestation" of mental retardation occurring before age twenty-two.'" *Turner v. Bowen*, 856 F.2d 695, 699 (4th Cir. 1988). The undersigned, therefore, finds that the IQ score of "77," which was awarded to Plaintiff in 1969 is not a valid score because the identity of the testing tool was not specified and, moreover, that absence a valid IQ score prior to the age of twenty-two (22) is not prejudicial to the Plaintiff.

The undersigned, therefore, finds the ALJ erred in his evaluation of the substantial evidence of record relative to Plaintiff's suffering from an impairment that meets or equals the Listings of impairments at 20 CFR Part 404, Subpart P., App.1, § 12.05C.

### D. Mental Residual Functional Capacity

The Plaintiff contends the ALJ's findings concerning the claimant's mental residual functional capacity and education were not supported by substantial evidence. Defendant asserts there was substantial evidence to support the decision of the Commissioner that Plaintiff could

perform the alternative work as identified by the vocational expert. The ALJ found that Plaintiff

retained "the residual functional capacity for simple, unskilled work at the light exertional level" (R.

24). In making this decision, the ALJ relied following:

> He [sic] emotional state is difficult to determine. Various mental health professionals
> have examined the claimant over the years with differing opinions. It is clear that
> since her divorce she has been depressed. . . . From a personality standpoint she is
> not willing to try to work. Her current mental health provider, Dr. Urick, gives her
> opinion that Ms. Jordan cannot withstand the pressures of work (Exhibit 35F). But
> her notes paint a somewhat brighter picture and her GAF is 55 (Exhibit 32F). Given
> her personality disorder the claimant certainly cannot do a job that required public
> contact. However, while it is a close case, I am not convinced that she could not do
> light janitorial work (R. 23-24).

Even though the ALJ, in the body of his decision, noted the opinions of "various mental health

professionals," he did not consider and analyze the findings of Ms. Fleschner and Dr. Wiese,

findings which qualify as substantial evidence of record.

The ALJ noted the January 29, 1999, psychological evaluation performed of Plaintiff by Ms.

Fleschner and Dr. Wiese; specifically, he discussed the results of the MMPI-2, BDI, and BAI tests

and recognized the examiners' findings that Plaintiff had major depressive disorder, recurrent,

without psychotic features; generalized anxiety disorder; reading disorder; and borderline intellectual

functioning. The ALJ did not consider, however, the examiners' findings that, "[due] to the

combination of psychological, educational, physical, and functional limitations . . . [Plaintiff] is

totally disabled currently . . ."; Plaintiff demonstrated a poor ability to deal with the public, use

judgment, deal with work stresses, function independently, and maintain attention/concentration; and

Plaintiff showed a poor ability to behave in an emotionally stable manner, relate predictably in social

situations, and demonstrate reliability (R. 281, 283, 285). In order for Plaintiff's RFC to be

accurate, the ALJ should have based it on all the relevant evidence of record. 20 C.F.R. §§ 404.1545

24

and 416.945. By not considering the opinions of Ms. Fleschner and Dr. Wiese as to Plaintiff's psychological, educational, physical, and functional limitations, the undersigned finds the ALJ failed to comply with this Regulation.

In addition to not considering the above findings by Ms. Fleschner and/or Dr. Wiese, the ALJ failed to weigh the opinions of Dr. Steward, Mr. Stein, Mr. Krautheim, and Dr. Urick relative to certain of Plaintiff's abilities in deciding Plaintiff's mental RFC. The Plaintiff, in her brief, asserts "[t]he Administrative law Judge failed to satisfy his 'duty of explanation' in indicating the weight he accorded the various medical opinions in the record" (citations omitted) (Plaintiff's brief at p. 14). The ALJ did consider the following: 1) Dr. Steward's August 16, 1999, opinion that "'[t]he combination . . . and severity of factors do appear to make [Plaintiff] functionally disabled to work and she will not likely be so on an indefinite basis" (R. 20, 342); 2) Mr. Stein's September 13, 1999, opinion that Plaintiff "had a 'poor' ability to deal with work stresses and understand, remember, and carry out complex detailed job instructions" (R. 21, 312); 3) Mr. Krautheim's November, 1999, opinion that "it would not be likely [Plaintiff] will ever maintain a consistant [sic] level of functioning to meet the needs of gainful employment" (R. 21, 319); and 4) Dr. Urick's November 13, 2002, opinions that Plaintiff's functioning was "very significantly affected by personality issues, which cause her to have a great deal of difficulty interacting with others in an emotionally stable and appropriate manner" and that Plaintiff was "unable to maintain employment due to her significant emotional difficulties" (R. 22, 463). The ALJ did not, however indicate the weight he afforded these opinions when assessing Plaintiff's mental RFC. The Fourth Circuit stated in *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984):

We cannot determine if findings are supported by substantial evidence unless the

Secretary explicitly indicates the weight given to all of the relevant evidence. *See,*
*e.g., Myers v. Califano,* 611 F.2d 980, 983 (4th Cir. 1980); *Stawls v. Califano,* 596
F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary,* 567 F.2d 258, 259 (4th Cir.
1977). As we said in *Arnold*: The courts . . . face a difficult task in applying the
substantial evidence test when the Secretary has not considered all relevant evidence.
Unless the Secretary has analyzed all the evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is
supported by substantial evidence approaches an abdication of the court's "duty to
scrutinize the record as a whole to determine whether the conclusions reached are
rational." 567 F.2d at 259.

The ALJ afforded "substantial evidentiary weight" in accordance with SSR 96-6p, to the Disability

Determination Service medical consultants opinion that Plaintiff "had no impairment or combination

of impairments that meets, or is equivalent to, the criteria of any of the listed impairments described

in Appendix 1 of the regulations at 20 CFR, Part 404, Subpart P" because he found that opinion to

be "consistent with the evidence" (R. 22). The ALJ did not, however, comply with the mandate of

*Gordon, Id.,* in that he did not, in the body of his decision, assign any weight to the relevant evidence

provided by Dr. Steward, Mr. Stein, Mr. Krautheim, or Dr. Urick, Plaintiff's consultative,

examining, and treating physicians, in assessing Plaintiff's mental RFC.

The Plaintiff also alleges the ALJ "ignored substantial evidence that indicated that [Plaintiff]

was illiterate" when assessing Plaintiff's RFC and, in doing so, failed to articulate accurate

limitations in the questions posed to the VE (Plaintiff's brief at p. 14).

The ALJ found Plaintiff to have attained a "marginal education" (R. 24). The ALJ

acknowledged at the hearing that the evidence of record was that Plaintiff could read and write on

"like . . . the second and third grade level" (R. 490). The ALJ, however, asked, in his hypothetical

question to the VE, . . . "this janitor job, you don't have to be, is a sixth or seventh grade education

okay?" The VE replied, "Yes, sir." The ALJ then stated, "Yeah. It doesn't require a lot of

educational training . . . for the light janitor work" (R. 509). The ALJ failed ask a hypothetical question of the VE that included the Plaintiff's correct educational standing and Plaintiff's functional illiteracy status. The evidence of record contained the following findings: 1) on September 14, 1998, Plaintiff was scored at the second grade level in reading, spelling, and arithmetic on the WRAT-III test (R. 258); 2) on January 29, 1999, Plaintiff was scored at the second grade level for reading and spelling and the third grade level for arithmetic and diagnosed with reading disorder and being illiterate (R. 279, 80, 281); 3) on August 17, 1999, Plaintiff was found to demonstrate no intellectual strengths, gross deficits in thinking and reasoning, and functionally disabled to work (R. 342); 4) on September 13, 1999, Plaintiff was found to function on a second grade level for reading and arithmetic and a first grade level for spelling and was diagnosed with functional illiteracy (R. 307, 308); 5) on June 14, 2001, Plaintiff was found to function within the poor range of intellect (R. 375); and 6) on November 13, 2002, Plaintiff was found to demonstrate limited cognitive abilities (R. 463).

The ALJ, even though he did acknowledge the evidence of record as to Plaintiff's second (and sometime first and third) grade level competency, did not include this limitation or the functional illiteracy and/or intellect limitation in the hypothetical question he asked the VE. In *Walker v. Bowen*, 876 F.2d 1097, 1101 (4th Cir. 1989), the Fourth Circuit held:

> For vocational expert's opinion to be relevant or helpful in disability benefits proceeding, it must be based upon consideration of all other evidence in record and must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.

The undersigned concludes the ALJ, in not including Plaintiff's first, second, and/or third grade level of competence and her literacy and intellect limitations, failed to formulate and ask a proper

hypothetical question, one that was based on the all the evidence of record, to the VE.

Finally, Defendant alleges that Plaintiff "asserted to the Appeals Council that the ALJ should have disregarded the vocational expert's testimony because, based upon her own reading of the 1991, Fourth Edition of DOT, the janitorial occupations are listed at the medium and heavy exertional levels (Tr. 479-38)." (Defendant's brief at p. 8.) Inasmuch as Plaintiff did not assert this argument in her motion pending before this Court, the Court finds the issue moot and offers no opinion as to same.

The undersigned, therefore, finds 1) the ALJ's decisions concerning the claimant's mental residual functional capacity and education are not supported by substantial evidence; therefore, the ALJ erred in formulating Plaintiff's mental residual functional capacity; 2) the ALJ erred in his assignment of weight to the opinions of Plaintiff's consulting, examining, and treating physicians; and the ALJ erred in not including all Plaintiff's limitations in the hypothetical question posed to the VE.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the

28

basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this _9_ day of August, 2005.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE